51 CCPA

**R. NEUMANN & CO., Appellant,**

v.

**OVERSEAS SHIPMENTS, INC., Appellee.**

**SETON LEATHER CO., Appellant,**

v.

**OVERSEAS SHIPMENTS, INC., Appellee.**

Patent Appeal No. 7171.

United States Court of Customs and Patent Appeals.

Jan. 23, 1964.

Worley, C. J., dissented.

Kay, Scholer, Fierman, Hays & Handler, New York City (Sidney A. Diamond, New York City, of counsel), for appellants.

Submitted on record by appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

R. Neumann & Co. and Seton Leather Co. appeal from a decision of the Trademark Trial and Appeal Board, 135 USPQ 280, which dismissed the consolidated oppositions of appellants [1] to appellee's application [2] for registration on the Principal Register of the term "DURA-HYDE" as a trademark for "plastic material of leatherlike appearance made into shoes." The application claimed first use as of April 15, 1958, by applying the mark "to the goods, and/or the packages containing same, and/or displays, and/or printing and embossing upon the goods, on which the trademark is shown." The mark is stamped on the shoes made of the material.

Appellants (opposers) alleged that "hide" is the common descriptive name for the whole pelt from a large animal, such as a cow or horse; that the term "hyde" is the phonetic equivalent of "hide" and that the term as applied to appellee's goods is deceptively misdescriptive under Section 2(e) (1) of the Trademark Act of 1946.

The record substantially supports the factual situation found by the board as follows:

"According to the record, the opposers have, for a long period of time, been engaged in the business of tanning the hides and skins of various animals to convert them into leather, which they have sold in substantial quantities throughout the United States and in foreign countries for use in the manufacture of many articles of merchandise, of which one of the principal products is shoes.

"Applicant is engaged primarily in importing or purchasing footwear from abroad and more particularly, from Japan. Its footwear is usually made of a plastic material but occasionally applicant purchases and sells leather footwear. Applicant does not, however, deal in the sale or distribution of component parts of shoes as distinguished from footwear as a whole.

"Applicant has, since late in the summer of 1958, used the mark 'DURA-HYDE' on and in connection with shoes imported from Japan constructed of a plastic upper and generally a rubber sole. The uppers are made to simulate both the grain appearance of leather and the color of tanned leather. Applicant also sells shoes under the mark 'DURA-HYDE-X' which differ from the 'DURA-HYDE' shoes to the extent that the plastic uppers have been treated with a special process which imparts to said material 'breathability.' The mark 'DURA-HYDE' or 'DURA-HYDE-X' appears on the soles and the sock liner of the shoes, on the shoe boxes, and on hang tags which are attached to one shoe. These tags prominently bear either the notation 'DURA-HYDE-X Shoes Outwear Leather 3 to 1' or 'Dura Hyde , (Outwears Leather).' The statements on these tags assertedly are based on the results of laboratory tests made by research or testing organizations and/or certain of applicant's retail customers. Shoes bearing the mark 'DURA-HYDE' have been sold by applicant throughout the United States, in Canada, and in some Latin American countries through retail outlets such as department stores and chain store groups, and, at times, through wholesale jobbers. Shipments of 'DURA-HYDE' shoes by applicant have averaged a half million pairs annually for each of the fiscal years 1958 to 1959 and 1959 to 1960. Applicant has, on occasion, advertised 'DURA-HYDE' shoes in the trade publication 'FOOTWEAR NEWS' and through direct mail solicitations of orders. Applicant is the owner of Registration No. 703,580, issued August 30, 1960, after these pro-

1. No. 39,612 filed January 4, 1960; No. 39,613 filed January 4, 1960.

2. Serial No. 72,881 filed May 4, 1959.

ceedings were instituted, disclosing the mark 'DURA-HYDE SHOES' for goods identified as shoes made of plastic material or leatherlike material.

"Applicant has made of record copies of thirty-seven registrations issued to others for marks comprising the term 'HIDE' or 'HYDE' for different products, the large majority of which are non-leather goods and are variously described as 'vinyl sheeting for use in the manufacture of handbags, belts, and the like,' 'Imitation animal skins,' 'Artificial leather,' 'Simulated leather,' and 'Leather substitute.'

"There is no question but that applicant markets plastic shoes or as opposers describe them, 'imitation leather foot wear' under the mark 'DURA-HYDE' and that 'HYDE' is the equivalent of 'HIDE,' which, as a noun, is the name for the pelt or skin of animals."

The board held that these facts were not sufficient to support a holding that the mark "DURA-HYDE" is deceptively misdescriptive within the purview of Section 2(e) of the statute. The board reasoned that the unitary mark "DURA-HYDE" would "at most merely suggest that" appellee's "plastic shoes are as durable as leather"; that the use of the word "GENUINE" on tags associated with the mark and affixed to the shoes by means of the tags conveyed no impression that the shoes were constructed of leather by virtue of the fact that the tags bore the legend "Outwears leather" or "Outwears leather 3 to 1"; that the third-party registrations of record revealed that it is common practice for manufacturers and dispensers of plastic or artificial leather products to adopt the term "HIDE" or its equivalent "HYDE" as a part of trademarks for their goods to suggest leatherlike characteristics; that "it is not believed that the average purchaser encountering a product sold under a mark comprising the term 'HIDE' or 'HYDE' would necessarily assume that said product is made of leather"; that in view of the many third-party registrations in conjunction with appellee's subsisting registration for the substantially identical mark DURA-HYDE, "it is not seen how the opposers can be damaged by the issuance to applicant of another registration for a mark incorporating 'HYDE' or 'HIDE'," and that the registration of the mark sought by appellee cannot preclude the appellants or their customers from using "HIDE" or "HYDE" on or in connection with their leather products.

The matter was briefed and argued before us by counsel for appellants. Appellee did not file a brief or appear by counsel but submitted on the record.

The issues considered by the board and here posed appear to be as stated by appellants:

"Whether the use of 'HYDE' as a component part of an alleged trademark for non-leather goods made to simulate leather renders such trademark deceptive and deceptively misdescriptive under Section 2(a) and Section 2(e) (1) of the Act of 1946.

"Whether the use of the term 'genuine' to describe a non-leather product bearing an alleged trademark incorporating the term 'HYDE' is evidence that such trademark is deceptive and deceptively misdescriptive under Section 2(a) and Section 2(e) (1) of the Act of 1946.

"Whether the registration of an alleged trademark containing the term 'HYDE' for an imitation leather product would result in damage to opposers, who make leather for products sold in competition with applicant's goods."

■ It is well settled by the decisions of this court and other courts of competent jurisdiction that no trademark rights can be acquired in a trademark that is deceptive or deceptively misdescriptive. The courts and, indeed, the Patent Office tribunals have been commendably zealous in the protection of the public interest from the practice of

deceit and deception. Worden & Co. v. California Fig Syrup Co., 187 U.S. 516, 23 S.Ct. 161, 47 L.Ed. 282.

In Ex Parte Puritan Piece Dye Works, 69 USPQ 257, "Wulized Finish" was denied registration under the Act of 1920 for piece goods made of rayon or protein fibers because the term deceptively indicated wool content and the fabric contained no wool. The Patent Office tribunal stated:

"Marks that are misleading, either in meaning or in implication, have long been looked upon with disfavor by this Office and by the courts. Ginter v. Kinney Tobacco Co., 12 F. 782, 22 O.G. 770; In re Bonide Chemical Co., 18 C.C.P.A. 909, 46 F.2d 705; In re International Resistance Co., 21 C.C.P.A. 1001, 69 F.2d 566; Worden v. California Fig Syrup Co., 187 U.S. 516, 23 S.Ct. 161, 47 L.Ed. 282. In the latter case, the Supreme Court of the United States laid down the unequivocal rule that 'where any symbol or label claimed as a trade mark is so constructed or worded as to make or contain a distinct assertion which is false, no property can be claimed on it, or, in other words, the right to the exclusive use of it cannot be maintained.'

" * * * any trade mark should protect its owner from unfair competition, and the public from being deceived; and a misleading trade mark serves neither purpose. Rather, it promotes unfair competition, and potentially victimizes, purchasers. Such marks should thus be refused registration * * *."

While not controlling here, we deem it proper to take cognizance of the fact that the Federal Trade Commission, which functions under a statute prohibiting "deceptive acts or practices in commerce," [3] repeatedly has condemned trademarks which include the term "hide" or "hyde" for nonleather products. See, for example, Textileather Corp., 15 F.T.C. 299 (1931) and American Hardware Co., 37 F.T.C. 724 (1943).

Appellants cite numerous decisions of the Commission prohibiting the use of a variety of trademarks containing "HYDE" or "HIDE" when applied to nonleather material, thus lending efficacious support to the contention here asserted that appellee's mark is deceptive and deceptively misdescriptive within the ambit of the Trademark Act of 1946.

We are unable to subscribe to the reasoning advanced by the board that "DURA-HYDE" would at most merely suggest that appellee's nonleather goods of leatherlike appearance "are as durable as leather" (emphasis supplied). The interjection of as between "durable" and "hide" supplies a distorted connotation. In this connection it is significant that appellee's president conceded that the prefix "dura" derived from "durability" and suggested "strong." We consider apposite here the statement by the United States Circuit Court of Appeals for the Third Circuit in Masland Duraleather Co. v. Federal Trade Comm., 34 F.2d 733, 736:

" * * * 'Dura' admittedly is an abbreviation of the word 'durable,' and the word [Duraleather] thus composed can be given no other meaning than 'Durable leather.' So read and considered, it is an assertion that the product marked, advertised, and sold as 'duraleather' consists of leather."

It would, therefore, seem logical to conclude that "DURA-HYDE" applied to "a plastic material of leatherlike appearance" would support the connotation of "durable hide" thus conveying to the minds of purchasers that the material was composed of leather.

We cannot harmonize with the record before us and the apposite decided cases the de minimis connotation attributed by the board to the word "Genuine" used by appellee on its tags in association with its mark. The board reasoned that

3. Federal Trade Commission Act, Section 5(a), 15 U.S.C. § 45(a).

these tags which were affixed to the shoes bore the legend "Outwears leather" or "Outwears leather 3 to 1" and such legend would therefore "clearly dispel any impression" that the goods were made of leather.

■ It is a matter of common knowledge that the adjective "genuine" has long been associated with leather as descriptive of the quality of that product. The expression "genuine leather" is one of common parlance used to distinguish leather from simulated products. The fact that appellee instantly employs the legends noted on its tags does not afford any assurance that it or any of its customers may not discard them at any time. The legends constitute advertisement material separate and apart from any trademark significance.

In Bonide Chemical Co., 46 F.2d 705, 18 CCPA 909, this court said:

"* * * It is also pointed out that there was filed in the hearing in the Patent Office, or with the amended application, 'a copy of one of the circulars used in advertising and selling applicant's material upon which there is shown underscored in ink the statements "Crow-Tox is non-poisonous and will not injure any kind of corn. Neither will it clog any planter or kill birds or animals."'

"This argument is beside the issue. *It is the word of the mark, not the statement of an advertising circular which appellant seeks to register * * *.*" [Emphasis supplied.]

In reiteration of this principle, this court in Kiekhaefer Corp. v. Willys-Overland Motors, Inc., 236 F.2d 423, 43 CCPA 1013, observed that:

"* * * the issues here must be determined on the basis of the applications involved rather than the actual way in which the parties used the marks. Hat Corp. of America v. John B. Stetson Co., 23 F.2d 485, 42

C.C.P.A., Patents, 1001; Intercontinental Mfg. Co., Inc. v. Continental Motors Corp., 230 F.2d 621, 43 C.C.P.A., Patents, 841."

■ While third-party registrations have evidentiary value, we think the board attached undue weight to the significance of the plethora of third-party registrations disclosed by the record as containing the terms "HIDE" or "HYDE." The board concluded, on the basis of the widespread adoption of "Hide" or "Hyde" to suggest the leather-like characteristics of plastic or artificial leather products, as shown by the third-party registrations, that the average purchaser would not assume that the product is made of leather.

The significance and evidentiary value attributed by the board to these third-party registrations is not consonant with the deliverances of this court pertaining to such registrations.

■ In In re Helene Curtis Industries, Inc., 305 F.2d 492, 49 CCPA 1367, this court said that third-party registrations

"* * * do not necessarily serve only to support the arguments of the party introducing them. Nor does it help an applicant on a section 2(d) likelihood of confusion issue to create a picture of already existing likelihood of confusion as between other marks by introducing a plethora of registrations of similar marks. We will not assume any knowledge on the part of the purchasing public of mere registrations in the Patent Office and neither will we assume that marks are in continuing use, so as to have had any effect on the mind of the purchasing public, merely because they have been registered. As the statute requires us to do, we will determine the issue on the basis of the mark sought to be registered, the goods named in the application, and the prior mark and the goods on which it is used or for which it is registered."

The mere existence of these third-party registrations does not, in our opinion, warrant the conclusion reached by the board.

The board held that registration of "DURA-HYDE" would not preclude appellants or their customers from the use of the terms "HIDE" or "HYDE" in connection with their products and hence no damages would ensue.

The board was apparently unmindful of the adverse effect on appellants' business in ways other than a possible interference with the use of the common descriptive term "HIDE." One of the principal purposes for which leather tanned by appellants is used is in the manufacture of shoes. To grant appellee a registration for "DURA-HYDE" as a trademark for "plastic material of leatherlike appearance made into shoes" would permit appellee to employ on a leather substitute a term which, we think, is deceptively misdescriptive. The goods of the contending parties are sold in the same channels of trade and are directly competitive. Cf. Singer Manufacturing Co. et al. v. Birginal-Bigsby Corp., 319 F.2d 273, 50 CCPA 1380.

We think that the reasoning applied by the Trademark Trial and Appeal Board in two more recently decided cases is apposite here.

In A. F. Gallun & Sons Corp. v. Aristocrat Leather Products, Inc., 135 USPQ 459, 460, the board sustained the right of the opposer, attacking an allegedly deceptive and deceptively misdescriptive mark for nonleather goods, to maintain the proceeding. The board said:

"* * * it is apparent that opposer could be injured by the registration of 'COPY CALF' if said term is deceptive or deceptively misdescriptive of applicant's goods as alleged. As the record shows, opposer tans the skins of calves into leather which is made into wallets and billfolds sold competitively with wallets and billfolds made by applicant. There is no doubt a substantial number of people who have a decided preference for wallets and billfolds made of leather, and if such persons are likely to be induced or mislead by applicant's use of the notation 'COPY CALF' into purchasing applicant's wallets and billfolds under the mistaken belief that they are products made of genuine calf leather, the loss of such sales by manufacturers of calf leather products may well result in a reduced demand for opposer's product. This economic injury clearly constitutes 'damage' within the meaning of Section 13 of the Statute."

We find even more apposite the more recent case (1963) of Steinberg Bros., Inc. v. Middletown Rubber Corp., 137 USPQ 319, wherein the board held:

"* * * the registration [for 'COLT-HYDE'] sought by applicant and the presumptions afforded thereby would be inconsistent with opposer's right and the right of its customers to use this term in connection with their leather goods. The fact that there is no indication in the record that opposer has ever used the designation 'COLT-HYDE' is of no moment where designations of this character are involved.

* * * * * *

"Finally, since opposer and applicant are competitors in that one sells a genuine leather product and the other a leather substitute for use in the manufacture of the same types of products, applicant's use and registration of 'COLT-HYDE' for vinyl fabrics would clearly adversely affect the business of opposer."

We are of the opinion that the registration here sought is of a mark within the prohibition of Sections 2(a) and 2(e) (1) of the statute. The record before us sufficiently substantiates the statutory requirement of likelihood of damage to opposer. See Singer, supra.

For the reasons stated, we hold that the opposition to registration of "DURA-HYDE" as a trademark for plastic ma-

terial should be sustained. The decision of the board is accordingly *reversed*.

Reversed.

WORLEY, Chief Judge (dissenting).

I see no error in the board's interpretation and application of the Lanham Act to the facts here. Accordingly, I would affirm.