Hearing:                                                              Mailed:
September 13, 2005                                              March 27, 2006
Bucher

THIS DISPOSITION IS
CITABLE AS PRECEDENT
OF THE TTAB

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re ALP of South Beach Inc.
_____

Serial No. 75819306
_____

Albert Robin of Cowan Liebowitz & Latman, P.C. for ALP of
    South Beach Inc.

Jennifer D. Chicoski, Trademark Examining Attorney, Law
    Office 115 (Tomas V. Vlcek, Managing Attorney).
_____

Before Bucher, Rogers and Kuhlke, Administrative Trademark
    Judges.

Opinion by Bucher, Administrative Trademark Judge:

   ALP of South Beach Inc. seeks registration on the

Supplemental Register of the term shown below:

CAFETERIA

for services recited in the application, as amended, as

"restaurants providing full service to sit-down patrons,

excluding cafeteria-style restaurants," in International

Class 42.[1]

This case is now before the Board on appeal from the final refusal of the Trademark Examining Attorney to register this designation based upon the ground that this term is deceptive under Section 2(a) of the Act.[2]

Applicant and the Trademark Examining Attorney submitted briefs, and both appeared at an oral hearing held on September 13, 2005 before this panel of the Board.

We affirm the refusal to register.

---

[1]    Application Serial No. 75819306 was filed on the Principal Register on October 12, 1999 based upon applicant's allegation of first use anywhere and first use in commerce at least as early as June 1998.  On July 10, 2001, applicant indicated its willingness to amend its application to the Supplemental Register on remand to the Trademark Examining Attorney for purposes of obtaining a registration of its mark.

[2]    Given the tortured prosecution history of this application, the Board sought to clarify the outstanding issues at the beginning of the oral hearing.  Based upon those discussions, applicant subsequently agreed with the Trademark Examining Attorney to amend this application unequivocally to the Supplemental Register, and to delete the earlier-proffered disclaimer of the word CAFETERIA apart from the specific presentation of this word as shown in the drawing.  The record shows that this was done in an Examiner's Amendment dated October 5, 2005.  As a result, the issue of deceptive misdescriptiveness under Section 2(e)(1) of the Act is now moot.

Moreover, the Trademark Examining Attorney's earlier contention that this term is incapable of being recognized as a source indicator under Section 23 of the Act pertained only to the source-indicating capability of the particular stylization of the lettering of CAFETERIA as shown in the mark, i.e., CAFETERIA, and was made at a time in the prosecution of this application when the word CAFETERIA had been disclaimed apart from the mark as shown.  Hence, we presume that the Trademark Examining Attorney's refusal based upon the incapability of the particular stylization of the lettering of CAFETERIA as shown in the mark to serve a source-indicating function, is also now moot.

The test for determining whether a mark is deceptive under Section 2(a) has been stated by the Court of Appeals for the Federal Circuit as:

> (1)  Is the term misdescriptive of the character, quality, function, composition or use of the goods (or services)?
>
> (2)  If so, are prospective purchasers likely to believe that the misdescription actually describes the goods (or services)?
>
> (3)  If so, is the misdescription likely to affect the decision to purchase?

In re Budge Manufacturing Co., Inc., 857 F.2d 773, 8 USPQ2d 1259, 1260 (Fed. Cir. 1988) [LOVEE LAMB held deceptive for seat covers not made of lambskin]. See also, In re Woolrich Woolen Mills, Inc., 13 USPQ2d 1235 (TTAB 1989) [WOOLRICH for clothing not made of wool found not to be deceptive under §2(a)].

We find that the word CAFETERIA used in connection with restaurant services that explicitly exclude cafeteria-style restaurants does misdescribe the services.  In fact, applicant appears to admit the same:

> Indeed, "cafeteria" is defined in Webster's New World Dictionary as "a self-service restaurant or lunchroom."  ALP's restaurant is neither self-service nor a cafeteria.  As shown by the materials submitted with the Leonard Declaration, ALP operates a very trendy "sit-down" restaurant at which patrons are served food and beverages.

Applicant's appeal brief, p. 5.

The next part of the *Budge* test is whether any prospective purchaser is likely to believe the misdescription.  *In re Quady Winery Inc.*, 221 USPQ 1213, 1214 (TTAB 1984).

The Trademark Examining Attorney argues from the evidence of record in this case that there are clearly restaurants that are categorized in restaurant guides, for example, as "cafeterias," and judging by a large sampling of eateries from around the country, one can find most anywhere in this country an establishment that refers to itself as a "cafeteria."  The Trademark Examining Attorney argues from the record that some restaurant patrons prefer cafeteria-style restaurants for their variety of foods, convenience and overall value.  Hence, at least some potential patrons are quite likely to believe that a restaurant calling itself CAFETERIA meets the common dictionary definition of a "cafeteria."

In support of her position, the Trademark Examining Attorney relies upon cases where a trademark is applied to consumer goods such as clothing, shoes or seat covers,

which marks may contain, for example, some form of the word

SILK[3] or HYDE/HIDE.[4]

Given the nature of the misdescription of these

restaurant services – a fact that applicant has admitted –

we must decide whether or not the instant case is at all

analogous to these SILK or HYDE/HIDE cases.

It is true that we are not dealing here with small

labels on clothing, shoes or seat covers, "which [labels]

purchasers may or may not note and which may or may not

always be provided." *In re Budge Manufacturing Co. Inc*.,

*supra* at 1261. Nonetheless, our primary reviewing court

has held that when considered in conjunction with the

identified goods or services, "the mark standing alone must

pass muster, for that is what the applicant seeks to

register, not extraneous explanatory statements," *Id. See*

*also, In re Berman Bros. Harlem Furniture Inc*., 26 USPQ2d

1514 (TTAB 1993) [FURNITURE MAKERS held deceptively

---

[3] *In re Phillips-Van Heusen Corp*., 63 USPQ2d 1047 (TTAB 2002)
[SUPER SILK is deceptively misdescriptive for clothing made of
silk-like fabric]; and *In re Shapely, Inc*., 231 USPQ 72 (TTAB
1986) [SILKEASE held deceptive as applied to clothing not made of
silk].
[4] *R. Neumann & Co. v. Overseas Shipments, Inc*., 326 F.2d 786,
140 USPQ 276 (CCPA 1964) [DURA-HYDE deceptive for shoes made of a
plastic material having a leather-like appearance]; *In re Intex
Plastics Corp*., 215 USPQ 1045 (TTAB 1982) [TEXHYDE held deceptive
as applied to synthetic fabric for use in the manufacture of
furniture, upholstery, luggage, etc.); and *Tanners' Council of
America, Inc. v. Samsonite Corp*., 204 USPQ 150 (TTAB 1979)
[SOFTHIDE held deceptive for imitation leather material].

misdescriptive for retail furniture store services not including the manufacture of furniture]; and *In re Woodward & Lothrop Inc.*, 4 USPQ2d 1412 (TTAB 1987) [CAMEO is deceptively misdescriptive for jewelry items without cameos or cameo-like elements].

However, applicant argues that we cannot find deceptive misdescriptiveness herein if indeed the determining factor is the probable reaction of reasonably prudent members of the public.

Applicant points out repeatedly that its expenditures on paid promotion have been most limited. Rather, it has relied largely upon free publicity in the mass media and word-of-mouth recommendations to build the "thunderous success"[5] of this enterprise. For example, applicant argues that "the most effective method of obtaining new patrons for a restaurant is word-of-mouth, a method which necessarily includes some amount of description and which could not lead to deception." Applicant's response of June 2, 2003. Additionally, applicant was able to take advantage of various forms of mass media (television, newspapers, glossy magazines, Internet sites, etc.), first in New York City and then later in Miami, to create a buzz

---

[5] Declaration of Susan Leonard, Chief Financial Officer of ALP of South Beach Inc., ¶2, March 21, 2001.

for applicant's establishments in Chelsea and South Beach, respectively. Prospective patrons reading these free media mentions would know the nature of applicant's restaurant(s) well before the targeted individuals ever entered onto the premises. These generally positive media descriptions have included "futuristic diner,"[6] "post-modern, upscale diner",[7] and "24-hour glorified coffee shop."[8]

We are not convinced, however, by applicant's arguments that everyone who comes into its CAFETERIA establishments knows in advance the nature of the restaurant. In reaching our decision herein on deceptiveness, we cannot rely on applicant's allegations about its current marketing strategies. Any registration that issues from this application will be national in scope, and applicant clearly would not be limited to the two establishments it currently operates. Certainly, we cannot assume that word-of-mouth publicity and detailed restaurant reviews are the only ways prospective consumers would ever encounter the mark. We must presume that magazine advertisements, classified ad listings, and highway billboards could some day be part of applicant's

---

[6] "The Dish: Star-tested delectables to try at home," *In Style*, May 1999.
[7] *WHERE New York*, 2002 – 2003.
[8] "Gotham Style," *New York*, June 1, 1998.

marketing mix, or alternatively, that a prospective patron might well chance upon the restaurant when driving or walking by,[9] and come in for a meal after seeing the signage on the exterior of the building.

It appears from a photograph of the Chelsea location that applicant's CAFETERIA mark is depicted on a canopy directly above floor-to-ceiling, glass garage-door panels. Applicant argues that any passerby could easily see that applicant's establishment is set up as a table-service restaurant. Accordingly,  applicant contends that it would be impossible for the potential patron – even one having no familiarity with the nature of applicant's services – to be able to view the mark on the front of applicant's restaurant without simultaneously realizing applicant offers table service.

We agree with applicant that our determination cannot be an exercise that takes place in the abstract. The question of deceptive misdescriptiveness must be considered in conjunction with the goods or services as seen in the marketplace.

---

[9] "The [restaurant] design is specifically calculated to attract passersby." *Interior Design*, September 1998.

Applicant cites to *Northwestern Golf Company* v.

*Acushnet Company,* 226 USPQ 240 (TTAB 1985) [applicant's

POWER STEP mark, as applied to golf clubs, is neither

deceptively misdescriptive nor deceptive, as the Board

concluded that "it is very difficult to see how purchasers

could be deceived by the mark into believing that the shaft

has but one step when even a quick glance at the golf club

will reveal that it has a multi-step shaft construction,

and purchasers are not likely to purchase golf clubs

without looking at them first"]; and *In re Econoheat, Inc.,*

218 USPQ 381 (TTAB 1983) [applicant's mark SOLAR QUARTZ, as

applied to electric space heaters, is neither deceptively

misdescriptive nor deceptive, with the Board stating that,

"[i]nasmuch as the probable reaction of the public is the

key issue and since even a casual perception of applicant's

heaters reveals that they operate just like any other

electrical appliance [designed to be plugged into an

electrical outlet], we do not believe that the public would

be deceived into believing applicant's goods are solar-

powered"]. *See* applicant's response of September 9, 2002.

We agree with applicant that what separates cases such

as *Northwestern Golf* and *Econoheat* (where marks were found

*not* to be deceptively misdescriptive or deceptive) from the

SILK and HYDE/HIDE cases cited by the Trademark Examining Attorney (where marks were found to be deceptively misdescriptive or deceptive), is that the Board found that merely contemplating the involved consumer items in the *Northwestern Golf* and *Econoheat* cases would be sufficient to enable a reasonable consumer to draw a correct conclusion about the nature of the respective products. *See also In re Robert Simmons, Inc*., 192 USPQ 331, 333 (TTAB 1976) [the mark WHITE SABLE on artists' paint brushes does not deceive purchasers into believing that the bristles are made from the hair or fur of a sable].

Applicant has pointed to cases where the casual observer of consumer products is presumed to be able to discover that the mark is obviously misdescriptive by looking at the involved goods. We do not find these cases involving a close-up visual examination of consumer items, such as golf clubs, space heaters and paint brushes, to be analogous to the allegedly misdescriptive service mark involved herein. Applicant has cited no cases saying that the owner of a service mark can advertise or display false information prominently about its services to prospective consumers, and then escape a finding of deceptiveness because the sale may ultimately not be consummated when the

customer discovers the misrepresentation just in time to avoid the transaction.

We really cannot be sure what portion of prospective customers, at some point, actually believed the deceptive misdescription. In his affidavit, Mark Thomas Amadei, Vice President of ALP of South Beach Inc. and one of applicant's principals, states that only a very few prospective customers appeared to have any misimpressions about the nature of applicant's services. We view this acknowledgement as significant. That some prospective customers did have a misimpression about the nature of applicant's services indicates to us that others may also have been misled. We find that this is similar to likelihood of confusion cases, where evidence of some instances of actual confusion can serve as a powerful demonstration that many more people are likely to be confused. For each prospective patron who actually voiced confusion over the misrepresentation, there may have been many others who left the restaurant without complaining or commenting.

We turn then to the third and final prong for deceptiveness under the _Budge_ test. Having found that prospective patrons of applicant's restaurant are

likely to believe that the misdescription actually describes the services, we must still determine whether the misdescription is likely to affect the decision to purchase.

This final prong of the *Budge* test has been restated as inquiring whether or not the misrepresentation would materially affect the decision to purchase the goods. In this context, applicant argues that this prong is not met because (1) applicant offers a higher class of services than the lunchroom or self-service restaurant services that the term CAFETERIA describes, and (2) the prospective patron who realizes her mistake is able to walk away from the reservation desk before purchasing a meal requiring full table service.

Applicant dismisses the SILK and HIDE/HYDE cases, arguing in this case that a table service restaurant is preferable to a cafeteria. The SILK cases[10] do discuss how silk is more desirable as a fabric than synthetic materials frequently used in its stead, or in a similar fashion, in the HIDE/HYDE cases, leather is found is more desirable to

---

[10]     S*upra,* footnote 3.

most consumers than are often-cheaper leather substitutes.[11]
By contrast, applicant's position – especially if one
assumes that as between competing styles of restaurants,
similar cuisine is being offered at comparable prices – is
that, for the majority of prospective diners, pushing a
tray through a lunchroom line is not preferable to being
seated at a table or booth with full table service provided
by capable wait staff.  In other words, applicant contends
that if the instant case involves any "bait-and-switch" for
some prospective patrons, the "switch" here is to a higher
class of services.

However, the Trademark Examining Attorney takes the
position that, without a doubt, the cafeteria experience is
a desirable one for some portion of the population.  She
argues that applicant has misrepresented its services by
choosing the term CAFETERIA to be used in connection with
restaurant services that exclude cafeteria-style
restaurants, and there is nothing in applicant's alleged
mark that dispels the deceptive nature of this designation.
As she argued in her denial of applicant's request for
reconsideration:

> "Evidence of record shows that cafeterias
> are generally less expensive than sit-down

---

[11]     Supra, footnote 4.

type restaurants and that they have
different characteristics that would be of
interest to potential consumers.  Thus, the
misrepresentation is likely to affect the
decision to purchase."

    …

"The examining attorney has established
through submissions of stories from the
LEXIS/NEXIS Research Database as well as
listings of restaurants from the World Wide
Web that the fact that a restaurant calls
itself 'CAFETERIA' provides information to
consumers who would be influenced by the
particular meaning that the term 'CAFETERIA'
has in the context of restaurants.  The
affordability, time-savings, and other
aspects of a true cafeteria are not features
of the applicant's trendy, popular,
expensive Manhattan or South Beach
restaurants catering to celebrities and
club-goers."

In spite of applicant's protests to the contrary, we conclude that there are features of a cafeteria that some prospective patrons will prefer to those of a table-service restaurant.  Thus, whether or not restaurant services have significant attributes of a cafeteria may be material to the decision to patronize a particular establishment.

We turn then to applicant's argument that the prospective patrons who realize their mistake are able to walk away from the reservation desk before purchasing meals requiring full table service.  In essence, much of the disagreement between applicant and the Trademark Examining Attorney at the oral hearing seemed to focus on *when* in

this process the deception actually occurs, or is remedied. The Trademark Examining Attorney argues that, even if it is true that it would be obvious immediately to virtually all consumers who reach the reservation desk that applicant's restaurant is not actually a cafeteria, by that point, the deception has already taken place. In fact, the Trademark Examining Attorney argues that deception attaches much earlier in the process. She argues that the question of whether a mark is deceptive must be made when the customers encounter the mark.

We agree that while descriptiveness or misdescriptiveness must be considered in relation to the services, this does not mean that prospective purchasers cannot be misled prior to arriving at the restaurant itself. Upon encountering applicant's mark for restaurant services in a promotional context, some share of prospective patrons will initially conclude, quite erroneously, that the referenced restaurant is, indeed, a cafeteria. Accordingly, we agree with the Trademark Examining Attorney on this question, and find that the critical point for gauging whether or not potential patrons believe the misdescription inherent in applicant's service mark is earlier than applicant has argued.

Assume, as we must, that reasonable prospective patrons of these services see informational signage preceding an Interstate highway exchange notifying them of the availability of CAFETERIA restaurant services among the listed eateries, and they pull off at the designated exit and then drive around until they find the restaurant. Or perhaps another group of prospective patrons seeks out the restaurant based on a classified advertisement for "Cafeteria" under the heading "restaurant services," believing that it offers cafeteria services. Or maybe it is a hungry family merely driving or walking by that decides to come in for a cafeteria meal after seeing the signage on the canopy on the exterior of the building.

By contrast, applicant takes the position that even consumers who may have been misled at some earlier timeframe, will discover their mistake once in the vicinity of the restaurant.

We certainly cannot say that reasonably prudent members of the public who wish to eat at a restaurant having the trademark CAFETERIA would be able to ascertain

from across the street or on the sidewalk that applicant's restaurant is not a cafeteria.[12]

Should the exterior not prove to be the clue, applicant argues that anyone who may continue to be misled up to the point that they entered the restaurant would quickly realize that the restaurant was not a cafeteria, and any deceptiveness of the name would quickly be dissipated. At least at the point of entry into the restaurant, applicant points out, the prospective restaurant patron will not believe the misdescription. Because of all the visual cues, at that juncture, such a belief is no longer plausible. Presumably some few customers may well not be disabused of their erroneous conclusions about the nature of the eating establishment until finding themselves escorted to a table in the back of a relatively small restaurant where they are handed a menu. We too find it highly implausible that someone seeking out a cafeteria experience would find herself ordering a table service meal from the wait staff, thinking all the while that she was eating in a cafeteria.

---

[12] Of course, a federal trademark registration for this mark issuing to applicant for the identified services would allow applicant to have any type of fenestration it chose, including smaller apertures having dark-tinted or heavily-glazed glass that would make it impossible for prospective patrons to ascertain the set-up of the restaurant's interior from the sidewalk.

However, we disagree with the thrust of applicant's analysis. The question of materiality is "whether or not the misleading information conveyed by the mark bestows upon the service greater marketability and is the reason why the services are desired and hence bought …." *In re Lyphomed Inc*., 1 USPQ2d 1430 (TTAB 1986). The emphasis here ought not to be placed on the term, "and *hence bought,*" as the factual situation of this type of service mark presents us with the question of "pre-sale" deception.

True, the state of being misled may well be dispelled before the customer completes the purchase. Nonetheless, customers will have been misled by the name in the first place – causing them to decide to patronize the restaurant. The critical point is not when the customers walk into the restaurant or when they are handed a menu, but when they encounter the mark in an advertisement, informational road sign, or the signage on the exterior of the restaurant, and then in each of these cases, making a decision to purchase the services. And whether prospective patrons who have been misled actually stay upon learning of their misapprehension ought not to be the determining factor under Section 2(a) of the Act. Irrespective of exactly where the patrons may be at the point they recognize the

deception (e.g., parking across the street, walking down the sidewalk, standing at the reservation desk, or sitting at a table), we find that by the time the prospective patrons are faced with the choice of either completing the purchase of a meal different from the one sought or finding another restaurant, deception has already taken place.

Our concern over pre-sale deception has parallels to the concept of "pre-sale confusion" in the context of trademark infringement and likelihood of confusion. *See Grotrain, Helfferich, Schulz, Th. Steinweg Nachf. V. Steinway & Sons*, 523 F.2d 1331 (2nd Cir. 1975). The defendant's actions may attract or lure potential customers by improperly benefiting from the goodwill that the plaintiff developed in its mark, even though any confusion as to the source of goods or services may be dispelled before an actual sale occurs.[13] Similarly, we find that the existence of pre-sale

---

[13] "By the time [the customer looking for a deal on a Steinway piano] gets to the store and realizes that the Steinweg is not really a Steinway, she may decide that the Steinweg is good enough and buy it anyway. Even is she doesn't, the deception may have cost her the better part of an afternoon, gas, wear and tear on her car, and a not insignificant bit of road rage. Courts correctly treat such pre-sale confusion as unfair competition and trademark infringement under the Lanham Act …."
*Cf.* "Initial Interest Confusion: Standing at the Crossroads of Trademark Law," by Jennifer E. Rothman, 27 *Cardozo Law Review*, 105, 161 – 162, http://www.cardozolawreview.com/ PastIssues/ROTHMAN.FINAL.VERSION.pdf

deception does not depend upon whether or not a sale is completed as a result of the deception. The mere fact that one may have decided to go to applicant's restaurant in order to patronize a true cafeteria, based solely upon applicant's choice of a deceptively misdescriptive name for a restaurant, is sufficient to meet the test of the final prong of the *Budge* test for deceptiveness.

Accordingly, we conclude that respondent's mark is deceptive under Section 2(a) of the Act.

*Decision*: The refusal to register this service mark under Section 2(a) of the Lanham Act is hereby affirmed.

- o O o -

Rogers, Administrative Trademark Judge, dissenting:

Applicant has been using the mark CAFETERIA for a restaurant in New York City since June 1998. The involved application, which seeks registration of the mark for services identified as "restaurants providing full service to sit-down patrons, excluding cafeteria-style restaurants," has been pending since October 12, 1999.

From the record, it appears clear the restaurant has been successful. *See*, in particular, paragraph 2 of the March 21, 2001 declaration of Susan Leonard, applicant's Chief Financial Officer, and paragraphs 2 and 8 of the September 5, 2002 declaration of Mark Thomas Amadei, applicant's vice president, each submitted with a response to an Office action. Ms. Leonard attests to the "thunderous success" of the restaurant, the expenditure of a million dollars "creating and merchandising" the restaurant, and "increasing revenues during each year of operation, with total revenues approaching $12,000,000." Mr. Amadei attested to the New York City restaurant having served two million customers over a four-year period, to extensive favorable publicity, and to applicant's plans to open two more CAFETERIA restaurants. While the record is not definitive, it appears that a Miami, Florida CAFETERIA restaurant opened in June 2003.

The June 1999 issue of *Bon Appetit* describes the New York City restaurant as follows:

> [I]t sits in the middle of the district called Chelsea, and its spirit is true not only to New York but also to the neighborhood that has become the city's destination of the moment. That means sheer downtown style gets added to the insomniac's hours—starting with the sleek geometric dining room that maybe could pass for a

> cafeteria only at Beverly Hills High.  Then there is the wait staff parading in Dolce & Gabbana's version of diner-wear (more high fashion than short order) and a hostess with blond braids who looks like Heidi heading off to a rave.
>
>  …
>
> But just when all the Holly Golightly gloss starts to seem a little heavy-handed, dinner arrives and Cafeteria's hip-hop veneer gives way to a heartland hoedown.

The September 1998 issue of *Interior Design*, in an article headed "*Hold the* Trays" (*emphasis* in original) reported:

> [Cafeteria] is an intriguing hybrid.  While its name was chosen to reflect a casual attitude in keeping with neighborhood norms, its sleek design, as conceived by Ilan Waisbrod of Studio Gaia, recalls no cafeteria we've ever known.
>
> "The owners had in mind a cafeteria for the year 2000," Waisbrod says of his first client encounter.  "Who knows what that means?"
>
>  …
>
> Cafeteria is essentially a crisp white volume with a quartet of glazed garage doors that open the interior to the street in good weather.  The design is specifically calculated to attract passersby.  The restaurant consists of three components: the primary dining space, a bar and a below-grade lounge ….[14]

---

[14]    The "New York Club Guide" in the December 1998 issue of *Details*, commenting on the Cafeteria lounge, reports:  Don't be fooled by the humble name:  "Fabulous" is the only word to describe the tiny late-night basement lounge of this Chelsea restaurant. **The Vibe**:  *Star Trek* meets *Vogue*:  white foam egg chairs, high-backed white vinyl banquettes, designer-blue walls, gorgeous multiethnic bartenders.  (emphasis in original).

And the *Flatiron News* (Volume 4, No. 4) reports, in a short review titled "*Tray Chic*":

> The name is a bit misleading.  Owners Adam Newton, Mark Thomas Amedei, Susan Leonard, and Stacy Pison have used a modish irony in calling their restaurant Cafeteria.  First of all, it doesn't look like any cafeteria I've done time in, smoking and playing cards, waiting for the hooter to signal the end of lunch.  Secondly, it is not self-service.

From these descriptions, no reasonably prudent consumer, reading about or visiting the restaurant, could conclude that the establishment was a "cafeteria."[15] Notwithstanding that applicant's New York restaurant plainly would not be perceived to be a traditional cafeteria, and that applicant seeks to register the mark for any restaurant but a cafeteria-style restaurant, the mark has been refused registration by the Examining Attorney, on the theory that CAFETERIA is "deceptive" under Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a).

Applicant's attempt to bestow the word cafeteria with a new meaning for the year 2000 (per *Interior Design*), or its use of irony in naming its restaurant (per *Flatiron News*), has resulted in applicant being subjected to the

---

[15]     The dictionary definition offered by the Trademark Examining Attorney defines a cafeteria as "a restaurant in which the customers are served at a counter and carry their meals on trays to tables."  *See* Office action of March 14, 2000.

penalty of permanent denial of registration.[16]  Though the
Lanham Act encourages registration of marks being used in
commerce, and applicant's mark appears from the record to
be working effectively in the marketplace, the Trademark
Examining Attorney's refusal of registration raises certain
questions:

- Does the word "deceptive" in Section 2(a) of the
  Act have a distinctly different meaning than the
  word "deceive" in Section 2(d) of the Act, or
  "deceptively" in Section 2(e) (apart from
  deceptive being an adjective, deceive being a
  verb and deceptively being an adverb)?

- Is there a sound basis in the law for protecting
  even the most gullible or careless consumer under
  Section 2(a) of the Act, or does the law require
  proof that even a reasonably prudent consumer
  would be deceived?

- How is the Board to interpret and apply the
  instruction of the Court of Appeals for the

---

[16]    *See In re California Innovations Inc*., 329 F.3d 1334, 66
USPQ2d 1853, 1855 (Fed. Cir. 2003)("[M]arks determined to be
primarily geographically deceptively misdescriptive are
permanently denied registration, *as are deceptive marks under
§1052(a).*")(emphasis added).

Federal Circuit that, when assessing registrability of a mark under Section 2(a), "the mark standing alone must pass muster, for that is what the applicant seeks to register, not extraneous explanatory statements"?[17]

- Does this appeal raise concerns about "bait and switch" marketing or theoretical "initial interest deception" akin to the notion of "initial interest confusion"?

- If the number of consumers who might be deceived, or the nature of their deception, is speculative, should the Board resolve doubt in favor of publishing the mark for opposition?

These questions relate more to the second and third factors of the *Budge* test. Therefore, it is necessary to separately address the first factor in that test, i.e., does CAFETERIA misdescribe "the character, quality, function, composition or use" of applicant's recited services? The answer to this question is not as clear as it might appear at first glance.

---

[17] *In re Budge Manufacturing Co., Inc*., 857 F.2d 773, 8 USPQ2d 1259, 1260 (Fed. Cir. 1988) (LOVEE LAMB held deceptive for seat covers not made of lambskin).

The majority is quite correct in observing that this appeal arose from an application with a tortured prosecution history. Applicant's counsel and the Trademark Examining Attorney each appeared, at times, to have been discussing theoretical or presumed arguments or positions of the other, with neither quite sure how many alternative positions and arguments were being presented or maintained. Accordingly, even the arguments in the briefs, not to mention arguments advanced in Office actions and responses thereto that preceded the appeal, must be viewed from the perspective that they were advanced as alternative positions; and statements made in conjunction with those arguments may not actually represent concessions of any issue to be examined under the _Budge_ test. I therefore do not view applicant as having conceded that CAFETERIA is misdescriptive when used in connection with the offering or rendering of the recited services.

The Trademark Examining Attorney argues that a term is misdescriptive when it "conveys an idea that is false, yet plausible" and asserts that CAFETERIA conveys a false idea about applicant's recited services because applicant has limited the services in connection with which the mark is used to restaurants excluding cafeterias. Brief,

unnumbered p. 5.  This argument, however, does not reveal what it is that a traditional cafeteria offers that applicant's non-cafeteria style restaurants do not, i.e., the argument does not explain the specific false, yet plausible, idea that the mark conveys.

The record suggests that consumers have various ideas of what makes a cafeteria a cafeteria, including value, familiar food, and a casual atmosphere.

There are many references in the record to the value that cost-conscious consumers find in cafeterias (indeed, this is a point stressed by the Trademark Examining Attorney in the context of explaining why some consumers seek out cafeterias).  The record is mixed as to the relative cost of the menu items in applicant's restaurant, and therefore the value a patron receives.  Many reviews find the prices reasonable, but some say items are overpriced.  Nonetheless, discussion of the subject of price and value in conjunction with applicant's restaurant bears out the Trademark Examining Attorney's argument that good value is one aspect of a traditional cafeteria.

In reviews of applicant's restaurant, there are references to the type of food one expects to find in a cafeteria:  "[I]nfected by the proletarian spirit, we chose

our food with this tradition in mind:  meatloaf, hamburger, tomato soup and a Caesar salad …"  *Flatiron News*; and "[T]here's also plenty of greasy-spoon inspired treats for those craving simpler pleasures:  the Cafeteria Macaroni and Cheese with a fontina twist, fried chicken [with] side-kicking buttermilk waffles[18] and maple sauce or their exquisite house meatloaf."  *Black Book*.  "Comfort food" is a phrase that appears in numerous reviews.  These references to the food suggest that applicant's restaurant is viewed as serving food similar to traditional cafeterias.

Finally, in some reviews of applicant's restaurant there are references to a dining establishment that is simply a comfortable place:  "Cafeterias are places remembered not for what they were, but for who we sat with when we were there.  This Cafeteria is a place you visit to be served a dollop of communitas, to join a crowd of locals sharing the day's dish, and to sluice your work-clogged soul with a cleansing drink."  *Flatiron News*; "[I]ts name was chosen to reflect a casual attitude in keeping with

---

[18]    The pairing of fried chicken and buttermilk waffles is confirmed by reviews in, among others, the *New York Post* of August 15, 1998, *Time Out New York*, August 6-13, 1998, issue no. 150 (the pairing "works"), and *Manhattan File*, September/October 1998.

neighborhood norms …." *Interior Design*.  The record reveals that whether applicant's restaurant is viewed as casual and comfortable, or upscale and sleekly designed, depends upon the point of view of the reviewer. Nonetheless, the general point presented by discussions of the décor and ambiance of applicant's restaurant, is the implication that a traditional cafeteria is a casual and comfortable place.

One other aspect of the dining experience in a traditional cafeteria is its self-service nature, whereby a diner places food items on a tray and carries them to a table.  This is clearly not done in applicant's restaurant.

In sum, the term cafeteria is in part descriptive and in part misdescriptive of applicant's restaurant.  Many consider it a restaurant that offers good value, although some do not, and the record is more supportive than not of a conclusion that the menu is much like that of a traditional cafeteria, albeit with some twists.  In these respects, CAFETERIA may be viewed as more descriptive than misdescriptive of applicant's restaurant.  On the other hand, what passes for a casual restaurant in New York City may not pass for a casual restaurant in many other areas of the country; and the absence of trays and self-service is

clearly not at all like a traditional cafeteria.  In this sense, CAFETERIA may be more misdescriptive than descriptive when used in conjunction with applicant's restaurant.  The instant appeal, then, presents a different case from *In re Berman Bros. Harlem Furniture Inc*., 26 USPQ2d 1514 (TTAB 1993), where the term FURNITURE MAKERS was in no way descriptive and instead was completely misdescriptive of the services of an applicant that made no furniture.[19]

The first factor of the *Budge* test seeks a yes or no answer to the question whether a term is misdescriptive of identified goods or services.  The mark in this case presents an issue of first impression, because the mixed record makes it impossible to answer the question in a simple yes or no fashion.  For the sake of argument, however, I shall presume that the answer to the question is "Yes, CAFETERIA is misdescriptive of applicant's recited

---

[19]     The *Berman Bros*. case, as one of the few cases involving services, rather than goods, and either a Section 2(e)(1) deceptive misdescriptiveness or Section 2(a) deceptiveness refusal, might appear a guiding precedent for the case at hand. I do not find it to be so, in part because it involved a completely misdescriptive mark, while the case at hand does not. Further, as discussed infra, the believable misdescription in *Berman Bros*. would not immediately be dispelled upon viewing or entering the *Berman Bros*.' store, while no reasonable consumer would persist in a belief that applicant's restaurant is a cafeteria upon merely looking at the restaurant from the front door.

services."  I turn then, to the second and third factors of *Budge*.

The second question of *Budge* is "are the prospective purchasers likely to believe that the misdescription actually describes the goods [or in this case services]?" The question does not use the phrase "any prospective purchaser"; nor does it use the phrase "any reasonably prudent purchaser."  In fact, it is significant that the *Budge* majority uses the plural "purchasers" rather than the singular purchaser.

Judge Nichols, in a *Budge* concurring opinion, noted that the *Budge* majority had transformed a question asked by a panel of this Board ("is anyone likely to believe the product is made of lamb or sheepskin?") into the second question of the *Budge* test ("are prospective purchasers likely to believe that the misdescription actually describes the goods?"):  "Thus, 'anyone,' a single individual, is transmuted into a class of persons."  I note, too, that the *Budge* majority found "[t]he board's factual inference is reasonable that purchasers are likely to believe …" (emphasis added).  Thus, it appears clear that the *Budge* majority would not subject a successful mark to the harsh consequence of permanent non-registrability

when a single consumer might be misled. That concern may very well have motivated and informed the *Budge* majority's transformation of the Board's question from one focusing on a single consumer to a question focusing on more than one consumer.

Judge Nichols in the concurring opinion, however, suggests that the real focus of the second question of the *Budge* test should be not whether a misdescription is believed by a single purchaser or multiple purchasers, but whether any purchaser who believes the misdescription is a reasonable person: "It is clearly what the board meant." Thus, it appears that the concern of Judge Nichols was not the majority's transformation of a board question cast in the singular to one cast in the plural, but in the majority's failure to qualify the nature of purchasers that would believe a misdescription as reasonable. Notwithstanding the concern of Judge Nichols, there is nothing in the *Budge* majority opinion that suggests belief in a misdescription by unreasonable consumers would support a permanent refusal of registration under Section 2(a).

As noted earlier in this dissenting opinion, prohibitions against the registration of marks that would deceive consumers are contained in Sections 2(a), 2(d) and

2(e) of the Act. There is no definition of deceive or deceptive in Section 45 of the Act. There is nothing in the statute to indicate that the prohibitions of these various sections against registration of marks that, in various ways, would deceive consumers, stem from different root meanings of the verb deceive or the adjective deceptive. Accordingly, the proscriptions against registration of marks that would deceive ought to be read in a consistent manner.

Under Section 2(d), we do not bar registration of a mark that is likely to "deceive" only a gullible or unreasonable consumer as to source. Rather, we bar registration of a mark that is likely to confuse or deceive a reasonably prudent consumer. *See Cancer Care, Inc. v. American Family Life Assurance Company of Columbus*, 211 USPQ 1005, 1014 (TTAB 1981) ("a prudent and careful individual"); *Justin Industries, Inc. v. D.B. Rosenblatt, Inc.*, 213 USPQ 968, 976 (TTAB 1981)("purchasers might reasonably assume"); *Kraft, Inc. v. Balin et al.,* 209 USPQ 877 (TTAB 1981)("the average reasonably prudent customer"); *West Point-Pepperell, Inc. v. Borlan Industries Inc.,* 191 USPQ 53 (TTAB 1976)("opposer has failed to persuade us

that … would be likely to cause confusion, mistake or deception of average reasonably prudent purchasers").

Similarly, the Board has applied the reasonably prudent consumer test in assessing whether a mark is deceptively misdescriptive under Section 2(e)(1). *See R.J. Reynolds Tobacco Company v. Brown & Williamson Tobacco Corporation*, 226 USPQ 169, 179 (TTAB 1985)("On this evidence, we do not believe reasonably prudent purchasers are apt to be deceived."). And the same reasonableness requirement is applied when assessing whether a mark is primarily geographically deceptively misdescriptive under Section 2(e)(3). *See In re Save Venice New York, Inc.*, 259 F.3d 1346, 59 USPQ2d 1778, 1783 (Fed. Cir. 2001)("we consider whether the public would reasonably identify or associate the goods sold under the mark with the geographic location contained in the mark").[20]

Given that the statute does not differentiate between the deceit or deception that is the subject of the proscriptions against registration in Sections 2(a), 2(d) and 2(e), and that the reasonably prudent purchaser

---

[20]   While the *California Innovations* decision, *supra*, explained that a Section 2(e)(3) refusal now requires the same proof as a Section 2(a) refusal, when a geographic mark is involved, it said nothing that would alter the reasonableness factor.

standard is applied in evaluating whether a refusal of registration is warranted under Sections 2(d) and 2(e), the same standard should be applied in evaluating whether a refusal of registration is warranted under Section 2(a). This is especially true when registration is sought only on the Supplemental Register and when the refusal would amount to a permanent bar against registration. As Judge Nichols observed in the *Budge* concurring opinion, "unreasonable persons are likely to believe anything." *Budge*, 8 USPQ2d at 1262. Unreasonable beliefs should not permanently bar registration of a functioning, successful mark that an applicant seeks to register on the Supplemental Register.

The Federal Circuit, in *Budge*, has explained that "extraneous explanatory statements" which might serve to obviate the deception created by a mark cannot be considered in assessing whether the mark is deceptive, for the mark alone is what the applicant seeks to register. *Budge*, 8 USPQ2d at 1261. This is not unlike the rule that says an applicant's use of a house mark in conjunction with a mark it seeks to register cannot be considered in evaluating likelihood of confusion, when the house mark is not part of the mark to be registered. *See Frances Denney v. Elizabeth Arden Sales Corp.*, 263 F.2d 347, 120 USPQ 480,

481 (CCPA 1959); and *Blue Cross and Blue Shield Association v. Harvard Community Health Plan Inc.*, 17 USPQ2d 1075, 1077 (TTAB 1990). In neither the deceptiveness refusal nor the Section 2(d) refusal involving a house mark, however, do we consider the mark in the abstract.

Registrability of a mark is always considered in conjunction with the identified goods or services, for an applicant cannot obtain rights in a mark in the abstract, only in connection with specified goods or services. This concept is not undone by the Federal Circuit's statement in *Budge* that "the mark alone must pass muster," when its registrability under Section 2(a) is in question. That statement is, as noted, intended to exclude from the calculation the extraneous statements or advertising that are not proposed for registration. While extraneous statements are excluded from the calculation, the identification of goods or services must be considered.

Applicant's identification excludes "cafeteria-style restaurants." Drafting of an identification to exclude an item or service that would otherwise be described by a mark can, however, result in refusal of registration on the ground that the mark is deceptively misdescriptive. *See Berman Bros.*, *supra*. *See also In re Woodward & Lothrop*

*Inc.*, 4 USPQ2d 1412 (TTAB 1987).  These two cases are distinguishable from the current case.  In both *Berman Bros*. and *Woodward & Lothrop*, registration was sought on the Principal Register, not the Supplemental Register, and the refusal was made under Section 2(e)(1) rather than Section 2(a).  Professor McCarthy has observed, in regard to these respective refusals:

> Apparently a mark can still have a misleading connotation and still not be "deceptive" under § 2(a).  But under the "deceptively misdescriptive" part of § 2(e), a higher standard of truthfulness will be required.  That is, the consumer is entitled to be told the truth, the whole truth and nothing but the truth, whether the misleading connotation is important or not.

2 J.T. McCarthy, *MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION* § 11.61 (4th ed. database updated December 2005).

These two cases are also distinguishable from the present case insofar as both marks would have required even reasonable purchasers to carefully examine, respectively, the furniture or jewelry of the applicants to determine the import of the marks.  The case at hand would not require even a gullible or careless consumer to engage in careful examination of applicant's restaurant.  As revealed by the descriptions recited earlier in this opinion, applicant's restaurant would not be mistaken for a traditional

- 37 -

cafeteria. And I do not believe it necessary or wise to speculate about whether applicant's identification of services would leave open the possibility of applicant some day adopting an exterior décor or look for its restaurants that would mask their true nature. The Board must, of course, assess a mark in light of what services are encompassed by an identification, but this does not require that we conjure up every possible way in which a service might be offered so as to intentionally mislead the public.

There may in this case be some concern about "initial interest deception," or whether prospective patrons of applicant's restaurant are subjected to a "bait and switch." There can be no deception, however, of those whose initial interest in applicant's restaurant is prompted by any of the restaurant reviews or entries from restaurant guides contained in this record. Applicant's restaurant plainly has not been reviewed as a cafeteria and, instead, has been reviewed as a sit-down restaurant. Any prospective patron whose interest was piqued by a review or guidebook entry would know what to expect.

On the other hand, a passerby who spied the awning over applicant's restaurant that, as shown by the photo in the majority opinion, contains only the word CAFETERIA

thereon, might walk across the street, or park a car and walk to the restaurant, thinking it a cafeteria. Even reasonable consumers, passing by a restaurant with an awning emblazoned with the word CAFETERIA, might stop to see if it were a cafeteria. Yet these prospective patrons would have but to look at the restaurant or its menu to discover their misapprehension. This is scarcely the stuff of a "bait and switch" operation, for the prospective patron can easily turn away without having been hooked. Further, I am not aware of any extension of the doctrine of "initial interest confusion," so often discussed in the Internet context, to bar registration of marks that assertedly may deceive for a moment. I do not think it wise to rashly extend the doctrine to the case at hand. Moreover, some courts require a showing of intentional deception before imposing liability on a defendant accused of creating initial interest confusion on the Internet. *See, e.g., Savin Corp. v. Savin Group*, 68 USPQ2d 1893 (S.D.N.Y. 2003).

In this case, I have doubt about the extent of the misdescription assertedly created by applicant's mark; I do not think reasonable consumers would be deceived; and I do not think any misunderstanding that may be created in the

minds of a very few consumers[21] would be more than fleeting. Further, I do not find the record to support a conclusion that the absence of self-service trays from applicant's restaurants would be material to purchasing decisions of prospective diners. Accordingly, I would reverse the refusal of registration and register the mark on the Supplemental Register.

- o O o -

---

[21] *See* paragraph 4 of the Amadei declaration:

"During the past four years some 2,000,000 persons have patronized the CAFETERIA restaurant …. There have been only a couple of instances in which the patron initially misperceived the nature of the restaurant. … In these couple of instances, the patron quickly recognized that CAFETERIA was a sit-down restaurant and proceeded to sit down and eat."

It is not for this Board to speculate about numerous theoretical patrons who may not have voiced displeasure or misunderstanding, when the result is a permanent bar of registration of a functioning, successful mark.